IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs January 27, 2015

**IN RE MALAYSIA C.**

**Appeal from the Chancery Court for Williamson County**
**No. 1619A     James G. Martin, III, Chancellor**

_____

**No. M2014-01019-COA-R3-PT - Filed February 10, 2015**

_____

This is a termination of parental rights case brought by Appellees, who are the prospective adoptive parents. Although Mother/Appellant initially joined in the petition to terminate her parental rights and for adoption, she later withdrew her consent. Appellees moved forward with the termination of Mother's parental rights on their own petition, which the trial court granted. Mother now appeals the trial court's termination of her parental rights on the ground of abandonment by willful failure to support the child. Mother also appeals the trial court's finding that termination of her parental rights is in the child's best interest. Because there is clear and convincing evidence in the record to support both the ground for termination of Mother's parental rights and the trial court's finding that termination is in the child's best interest, we affirm and remand.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court is
Affirmed and Remanded**

KENNY ARMSTRONG, J., delivered the opinion of the Court, in which J. STEVEN STAFFORD, P.J., W.S., and ARNOLD B. GOLDIN, J., joined.

Raquel Avina Abel, Franklin, Tennessee, for the appellant, M.C.[1]

W. I. Howell Acuff, Cookville, Tennessee, for the appellees, S.J.J.G. and K.R.G.

_____

[1] We note that Ms. Abel did not represent Mother in the trial of this matter.

1

# OPINION

## I. Background

The child at issue in this case, M.J.C., was born in December 2010 to Appellant M.C. ("Mother").[2] Mother has one older child who is currently in Mother's custody. Custody of the older child is not at issue in this appeal. M.J.C.'s biological Father, M.L.'s, parental rights were terminated by the same order that terminated Mother's parental rights. However, he did not appeal the termination of his parental rights and is not a party to this appeal. Accordingly, our discussion will address only the facts, procedure, and findings relevant to termination of Mother's parental rights.

The prospective adoptive parents, S.J.J.G. and his wife, K.R.G. ( together "Appellees") first met the child in June 2012. At that time, Appellees had completed a home study, and were hoping to adopt a child. Appellees have two biological children. S.J.J.G. is the founder of a software company, and he works primarily from home, traveling once or twice a week. K.R.G. does not work outside the home.

In January 2012, Mother was evicted from public housing for fighting. Mother testified that she moved from place to place in the months following her eviction. Due to these unstable circumstances, sometime before June 2012, Mother placed the child with Mother's cousin, I.M.

I.M. and Appellees were acquaintances, who had mutual friends. K.R.G. and I.M. were also friends on Facebook. I.M. posted on Facebook that she was caring for the child, and that it was difficult because I.M. was also caring for her own children. K.R.G. contacted I.M. and suggested that Appellees take the child for a few days to provide a "break" for I.M., and I.M. agreed. Between June 2012 and August 2012, the child stayed with Appellees on two or three occasions, and a bond began to develop between Appellees and the child. I.M. sent Mother photos of the child in the Appellees' home, and this is how Mother came to know that the child was staying with Appellees. In August 2012, K.R.G. called Mother to say that the Appellees were willing to take custody of the child. Mother agreed to the arrangement, and, on August 28, 2012, the child came into Appellees' home, where she has remained since that time.

---

[2] In cases involving minor children, it is the policy of this Court to redact the parties' names so as to protect their identities.

In September 2012, Appellees and their attorney met with Mother to discuss Appellees' desire to adopt the child. There is some dispute in the record as to where this meeting occurred. Also, as discussed in greater detail below, there is some dispute as to whether Mother understood that the discussion involved more than just a temporary custody arrangement. Regardless, on September 12, 2012, Mother signed a petition for termination of her parental rights and petition for adoption in favor of the Appellees. The petition specifically states that:

> [Mother] joins in this Petition for the purpose of providing her consent to the adoption and for purposes of terminating her parental rights to [the child].
> . . .[Mother] understands that the entry of an order confirming parental consent, without revoking the parental consent prior to entry of such order, will terminate her parental rights to the child forever and she will have no legal rights to the custody, control, or to visitation with the child in the future.

Mother's signature on the petition was notarized, and the document was filed in the Williamson County Chancery Court. On September 21, 2012, Appellees filed a motion for partial guardianship. The trial court granted their motion by order entered on September 26, 2012.

Text messages sent between Mother and K.R.G. in October 2012 (which were admitted as Trial Exhibit 4) indicate Mother's desire to have the child remain in Appellees' home:

> [From Mother to K.R.G.] I'm not gone [sic] change my mind[.]
> I know [the child is] in good hands with [K.R.G. and S.J.J.G.].
> And I know your kids love her as well. . . .
>
> I just want her to[] come visit and stay the night with me sometimes. . . .

However, sometime in December 2012, Mother contacted Appellees, asking that the child be returned to her custody. Appellees denied Mother's request, and the relationship between Mother and Appellees deteriorated.

On December 3, 2012, Appellees filed an amended petition for termination of parental rights and petition for adoption. Although Mother is listed as a "Co-Petitioner," she did not sign the amended petition, which contains only the signature of Appellees' lawyer.

On January 14, 2013, the trial court entered an order, appointing a guardian ad litem to represent the child. On March 14, 2013, the guardian ad litem filed a motion requesting that the trial court review the status of the case. Therein, the guardian ad litem specifically requests that the court "assure that all statutory requirements have been met and due process measures have been made. . . ." The guardian ad litem further explained:

> [O]n October 2, 2012, an order of partial guardianship was entered *ex parte* with the legal effect of taking the mother. . .out of any further legal proceedings, and leaving her without legal recompense for a failure to provide statutory notice of a consent hearing; failure to receive the time or notice of her right to revoke her consent to such proceedings prior to her participation in a consent hearing; failure of her being questioned in chambers or in court regarding her understanding of her parental consent in this matter; failure of her waiver of counsel of her waiver of her right to receive social counseling with regards to her parental consent; failure of her waiving her right to such notice, hearing, and revocation time frame; and without her ever presenting herself before the Court in this matter at any time. The mother claims she never received a copy of the *ex parte* order, and she was not certified in the order as having been provided a copy of it. The legal effect of the partial guardianship order took the mother out of having standing to contest any further proceedings, and the time frame to appeal the partial order of guardianship has long expired.

The guardian ad litem also noted that Mother had not consented to the amended petition to terminate her parental rights. Thereafter, a uniform affidavit of indigency was entered on behalf of Mother; on April 8, 2013, a lawyer was appointed to represent Mother in these proceedings.

On May 2, 2013, Mother, through her lawyer, filed a petition to revoke her consent for adoption and a petition for custody and parenting time with the child. In her petition, Mother avers that she "did not freely or voluntarily sign the consent for adoption, nor was it signed with full knowledge of its consequences." Furthermore, Mother's petition indicates that she "revokes her consent to the adoption of her minor child. . . ." On July 1, 2013, Appellees filed an answer to Mother's petition, wherein they aver, in relevant part, that:

> [Mother] met with [Appellees] and their counsel prior to the petition for termination of parental rights and petition for

4

adoption being drafted. At that meeting[, Mother] was informed that [Appellees], at their expense, would provide he[r] with her own legal counsel if she had any concerns about the adoption. She declined to have counsel retained for her. At that meeting, with [Mother's] agreement, it was decided that she would join in the petition and not surrender her rights until the final hearing, thus protecting her rights in the event, and only in the event, that the rights of the birth-father could not be terminated. The next week, [Mother] again met with [Appellees'] counsel, this time at the courthouse, to review and sign the petition for termination of parental rights and for adoption, counsel again explained that termination of her rights would not be addressed until the birth-father's rights had been terminated, but that the child would be with the [Appellees] in the meantime. Counsel provided her the original of the petition to review and allowed her time to read it through carefully. When she had finished reviewing the document, counsel asked if she had any questions or concerns. She affirmed that she was in agreement with the document. She then signed the petition for termination of parental rights and petition for adoption before a notary.

Concurrent with their answer, Appellees filed a cross-petition for termination of parental rights and petition for adoption, in which they aver that Mother has "abandoned the child . . . [in that she] has provided no support for this child, or in the alternative has provided no support since August of 2012." Appellees further aver that termination of Mother's parental rights is in the child's best interest. On July 26, 2013, Mother filed an answer to the cross-petition for termination of her parental rights, wherein she specifically denies that she has abandoned the child by willful failure to pay support.

On September 19, 2013, the trial court entered an "Interim Order," which states, in relevant part that Mother's revocation of her consent to the adoption of the child "is well taken . . . and all portions of the petition for termination of parental rights and petition for adoption containing her consent are hereby voluntarily withdrawn and dismissed due to the revocation of her consent for the adoption." The order places temporary custody of the child with Appellees, and allows Mother supervised visitation. All other matters were reserved for full hearing.

The cross-petition to terminate parental rights was heard on March 12 and 13, 2014. On April 29, 2014, the trial court entered its memorandum and order. Therein, the court terminated Mother's parental rights on the ground of abandonment by willful failure to

provide support for the child, and upon its finding that termination of Mother's parental rights was in the child's best interest. Mother filed a timely notice of appeal. Based upon the adjudication of indigency, a lawyer was appointed to represent Mother in this appeal.

## II. Issues

Mother raises five issues for review as stated in her brief:

> 1. Whether there is clear and convincing evidence to support the termination of parental rights for abandonment by willful failure to support?
>
> 2. Whether the Court can terminate parental rights for abandonment for willful failure to support the child where the parent never received notice that she had a duty to pay support and that the failure to support could result in the termination of parental rights?
>
> 3. Whether the aggregate of the evidence supports a finding of willful failure to pay support where the parent has significant limitations that affected her testimony and her ability to understand the legal process?
>
> 4. Whether the Court can terminate parental rights for a willful failure to pay support where the prospective adoptive parents obtained custody by an invalid order of parental guardianship, refused to accept support and then sought to terminate for failure to support?
>
> 5. Whether clear and convincing evidence supports the trial court's determination [that termination] of Mother's parental rights was in M.C.'s best interest[]?

## III. Standard of Review

Under both the United States and Tennessee Constitutions, a parent has a fundamental right to the care, custody, and control of his or her child. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *Nash–Putnam v. McCloud*, 921 S.W.2d 170, 174 (Tenn. 1996). Thus, the state may interfere with parental rights only when a compelling interest exists. *Nash–Putnam*, 921 S.W.2d at 174–75 (citing *Santosky v. Kramer*, 455 U.S. 745 (1982)). Our termination

6

statutes identify "those situations in which the state's interest in the welfare of a child justifies interference with a parent's constitutional rights by setting forth grounds on which termination proceedings can be brought." *In re W.B.*, Nos. M2004-00999-COA-R3-PT, M2004–01572–COA–R3–PT, 2005 WL 1021618, at *7 (Tenn. Ct. App. Apr. 29, 2005) (citing Tenn. Code Ann. § 36-1-113(g)). A person seeking to terminate parental rights must prove both the existence of one of the statutory grounds for termination and that termination is in the child's best interest. Tenn. Code Ann. § 36-1-113(c); *In re D.L.B.*, 118 S.W.3d 360, 367 (Tenn. 2003); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002).

Because of the fundamental nature of the parent's rights and the grave consequences of the termination of those rights, courts must require a higher standard of proof in deciding termination cases. *Santosky*, 455 U.S. at 769. Accordingly, both the grounds for termination and that termination of parental rights is in the child's best interest must be established by clear and convincing evidence. Tenn. Code Ann. § 36-3-113(c)(1); *In re Valentine*, 79 S.W.3d at 546. Clear and convincing evidence "establishes that the truth of the facts asserted is highly probable . . . and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *In re M.J.B.*, 140 S.W.3d 643, 653 (Tenn. Ct. App. 2004). Such evidence "produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established." *Id*. at 653.

In light of the heightened standard of proof in termination of parental rights cases, a reviewing court must modify the customary standard of review in Tennessee Rule of Appellate Procedure 13(d). As to the trial court's findings of fact, our review is *de novo* with a presumption of correctness unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d). We must then determine whether the facts, as found by the trial court or as supported by the preponderance of the evidence, clearly and convincingly establish the elements necessary to terminate parental rights. *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002). When the resolution of an issue in a case depends on the truthfulness of witnesses, the trial judge who has had the opportunity to observe the witnesses and their manner and demeanor while testifying is in a far better position than this Court to decide those issues. *See Whitaker v. Whitaker*, 957 S.W.2d 834, 837 (Tenn. Ct. App. 1997); *McCaleb v. Saturn Corp.*, 910 S.W.2d 412, 415 (Tenn.1995). The weight, faith, and credit to be given to any witness's testimony lies in the first instance with the trier of fact, and the credibility accorded will be given great weight by the appellate court. *See Whitaker*, 957 S.W.2d at 837; *McCaleb*, 910 S.W.2d at 415; *Walton v. Young*, 950 S.W.2d 956, 959 (Tenn. 1997).

## IV. Procedural and Due Process Issues

### A. Petition to Terminate Parental Rights and for Adoption

7

Mother first contends that the Appellees did not comply with certain statutory requirements when they presented Mother with the original petition to terminate her parental rights and for adoption. Specifically, Mother argues that the Appellees: (1) failed to advise her of her right to revoke her consent, the beginning and ending period for revocation of surrender, or the procedures for revoking as required by Tennessee Code Annotated Section 36-1-111(e); (2) failed to advise Mother of her right to social counseling regarding her decision to surrender her rights; and (3) failed to attach a certificate of satisfaction or withdrawal of Mother's right to receive legal or social counsel as required by Tennessee Code Annotated Section 36-1-111(d)(4). Mother contends that these procedural shortcomings deprived her of essential information, and constituted an abuse of due process.

Mother further contends that she did not understand that the petition indicated her consent to termination of her parental rights. Mother testified that she thought the petition provided only for the child's "temporary" placement with Appellees. Mother asserts that it was always her intention to take the child back into her custody once she "got back on her feet."

As discussed in detail above, the court granted Mother's petition to revoke the consent she gave in the petition to terminate her parental rights and for adoption. Because Mother was allowed to withdraw her consent, any procedural shortcoming affecting Mother's rights or having any impact on her knowledge of what she was signing, were cured when her consent was withdrawn. In short, the disputed petition (insofar as Mother consented to it) was rendered null and void. Importantly, Mother's parental rights were not terminated upon adjudication of either the original or the amended petition (which both contained consent language *vis* Mother). Rather, the termination proceedings were based upon the cross-petition for termination and adoption that Appellees filed July 1, 2013. At this point, Mother was represented by counsel. She filed an answer to the cross-petition, wherein she denied the material allegations made in the cross-petition. Furthermore, Mother was given the opportunity at the hearing to cross-examine witnesses, and to put on her own proof. Accordingly, even if we allow *arguendo* that the original and/or amended petitions were somehow procedurally flawed, or fraudulently executed, because neither of these petitions formed the basis for the termination of Mother's parental rights, and because she was allowed to withdraw her consent, shortcomings in these petitions cannot form the basis of reversal on appeal.

### B. Order of Partial Guardianship

Mother argues that the *ex parte* order of partial guardianship entered on September 26, 2012 was an "invalid order." As discussed in detail above, this case began with the agreement of Mother and the Appellees that the child would remain in the Appellees' care. Out of concern that the rights of the birth-father may not have been subject to termination, Appellees and

Mother agreed that her surrender of parental rights would not take place until after the birth-father's rights had been terminated. As a result of this agreement, Mother joined the initial petition to terminate her parental rights and for adoption.

Both of the Appellees testified that adoption was always the goal, and that they would not have kept the child in their home had Mother not agreed to that outcome. Regardless, there can be no dispute that, at the time the court entered the order of partial guardianship, the child was living in Appellees' home, with the Mother's consent. Accordingly, at that time, there was need for the Appellees to have authority to make decisions for the child. The order of partial guardianship accomplished that by giving Appellees the right, and imposing a duty upon them, to "provide for the care, protection, training and education, and the physical, mental, and moral welfare of the child." The order also gave the Appellees the right to seek medical treatment for the child, and to obtain information regarding the child's medical records. These were necessary rights and duties that the Appellees needed in order to properly care for this child. In other words, the trial court was not addressing the surrender of Mother's parental rights; rather, the order of partial guardianship was merely a means of allowing Appellees the legal authority to care for the child. Therefore, under the particular circumstances of this case, we cannot conclude that the trial court erred in entering the order of partial guardianship in favor of Appellees.

Nonetheless, Mother contends that the Appellees used this order to deprive her of any contact with the child. The record does not support this contention. Rather, it was not until Mother, sometime in December 2012, threatened to take the child from the Appellees' home, and further indicated that she was then living with the child's birth-father, who has an alleged history of criminal behavior, that the Appellees denied Mother access to the child. Appellees testified individually that they were concerned for the child to be in Mother's home during this time, and that they denied her visitation based only on this concern. However, even if we allow, *arguendo*, that the Appellees used the authority granted to them under the partial guardianship order to keep Mother from seeing the child, this would only address the ground of abandonment by willful failure to visit. As discussed below, the sole ground for termination of Mother's parental rights was abandonment by willful failure to support. In short, it does not appear from the record that this *ex parte* order, even if it was obtained without notice to Mother, had any bearing on the trial court's decision to terminate Mother's parental rights.

Even if we concede that the better practice would have been to provide Mother with a copy of the order of partial guardianship, any procedural concerns regarding the trial court's decision to enter this order were cured when the trial court, upon the guardian ad litem's motion, held a hearing on August 12, 2013 and then entered the "Interim Order," placing temporary custody of the child with Appellees. This ruling ostensibly rendered the *ex parte*

order of partial guardianship null.  Mother has raised no issue concerning the "Interim Order."

### C.  Mother's Disability and Alleged Failure to Understand the Proceedings

According to her own testimony, Mother has bi-polar disorder.  In its order terminating her parental rights, the trial court found:

> While [Mother] is disabled because of her mental condition, the Court does not find that her condition, per se, necessarily prevents [Mother] from providing safe and stable care and supervision for [the child].  However, [Mother] contends that her mental condition does impair her memory, and the Court finds that, to some extent, it may have impaired [Mother's] ability to testify accurately to the facts and circumstances giving rise to her signing the petition for termination of her parental rights and consent for adoption and as to other facts in this case. In addition, at the time of the trial, [Mother] was not taking the medication prescribed to treat her bipolar condition and depression.  She needed to go to. . . the place from which she received mental health treatment, for a new prescription and had not done so.  It is important for a parent to be consistent in the position that they take with children.  To the extent [Mother] is incapable of recalling what she says and does from time to time, such incapacity can clearly impair her ability to be consistent in parenting [the child].

From our review of the transcript, we agree with the trial court that, although Mother may have had some difficulty recalling events, there is no indication that Mother did not understand the proceedings concerning termination of her parental rights.  Although we sympathize with Mother's mental condition, we further agree with the trial court that it is incumbent upon Mother to ensure that she is taking her medications properly.  Her unilateral failure to do so cannot provide the basis for reversal of the trial court's decision to terminate her parental rights.  This is especially true in light of the fact that Mother was represented by a court-appointed lawyer during all relevant proceedings.

Nonetheless, in her appellate brief, Mother avers that

> [Appellees] took a poor, uneducated, desperate and homeless mother and offered to take care of her daughter.  They provided

her with paperwork to sign that consented to the termination of her parental rights and consented to the adoption of her daughter by the [Appellees]. Represented by counsel, when she had none, the [Appellees] violated the very statutory protections that the legislature put in place to protect the constitutional rights of the parents to raise their children. . . . They took their invalid and improper paperwork that failed to give Mother essential notice of her rights, and they used it to get an invalid, *ex parte* Order of Partial Guardianship. They then withheld Mother's child from her and refused to accept her offers of assistance, setting the stage for their Petition to Terminate Parental Rights on July 1, 2014, where they alleged that Mother had failed to visit and failed to pay support from March 31, 2014 to July 1, 2014.

In light of the actual circumstances and record in this case, Mother's excoriation of Appellees is somewhat hyperbolic. Although Mother has only an 11th grade education, there is no indication that she did not fully understand that Appellees' intention was to adopt M.J.C. The initial petition, which Mother testified she read and signed, clearly states that it is a "petition for termination of parental rights **and petition for adoption**." Mother testified that she can read, but that she has difficulty understanding "big words." The word "adoption" is widely used in common parlance, and we cannot conclude that Mother, given the level of education she has, would have had any difficulty understanding what that term meant. Although Mother testified at the hearing that she did not understand that the petition contemplated adoption, this testimony was impeached with the conflicting testimony Mother gave in her discovery deposition. Therein, Mother was asked whether she understood that the Appellees "were looking to adopt;" Mother replied "Yeah." K.R.G.'s testimony indicated that during all of the conversations with Mother, Appellees had no indication that Mother did not understand that Appellees were seeking adoption and permanent custody of this child.

Although there is some dispute in the record concerning Mother's memory of the events surrounding her execution of the original petition in this case, and concerning the question of whether she fully understood that adoption was the end goal, we have previously discussed the fact that any errors in the original or amended petitions to terminate her parental rights and for adoption were cured when Mother was allowed to withdraw her consent. Furthermore, as discussed above, the "Interim Order" did not give Appellees any right or power to keep Mother from providing support for this child; rather, as discussed below, even if Appellees had refused Mother's help, this fact should not have kept Mother from paying funds into the court for the child. There is no indication that Mother took any initiative, even after she was represented by counsel, to provide such support.

### V. Ground for Termination of Mother's Parental Rights

Mother's parental rights were terminated on the sole ground of abandonment by willful failure to pay support pursuant to Tennessee Code Annotated Section 36-1-113(g)(1) and Tennessee Code Annotated Section 36-1-102(1)(A)(I). In pertinent part, Tennessee Code Annotated Section 36-1-113(g) provides:

> (g) Initiation of termination of parental or guardianship rights may be based upon any of the grounds listed in this subsection (g). The following grounds are cumulative and non-exclusive, so that listing conditions, acts or omissions in one ground does not prevent them from coming within another ground:
> (1) Abandonment by the parent or guardian, as defined in § 36-1-102, has occurred;

Tenn. Code Ann. § 36-1-113(g)(1). Tennessee Code Annotated Section 36-1-102 defines "abandonment," in relevant part as follows:

> (1)(A) For purposes of terminating the parental or guardian rights of a parent or parents or a guardian or guardians of a child to that child in order to make that child available for adoption, "abandonment" means that:
>
> (I) For a period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the a [sic] parent or parents or a guardian or guardians of the child who is the subject of the petition for termination of parental rights or adoption, that the parent or parents or a guardian or guardians . . .have willfully failed to support or have willfully failed to make reasonable payments toward the support of the child;

Tenn. Code Ann. § 36-1-102(1)(A)(I). Further, "token support" means that the support, under the circumstances of an individual case, is not significant considering the parent's means. Tenn. Code Ann. § 36-1-102(1)(B).

In *In re Audrey S.*, 182 S.W.3d 838 (Tenn. Ct. App. 2005), this Court discussed willfulness in the context of termination of parental rights cases:

The concept of "willfulness" is at the core of the statutory definition of abandonment. A parent cannot be found to have abandoned a child under Tenn. Code Ann. § 36-1-102(1)(A)(I) unless the parent has either "willfully" failed to visit or "willfully" failed to support the child for a period of four consecutive months.... In the statutes governing the termination of parental rights, "willfulness" does not require the same standard of culpability as is required by the penal code. Nor does it require malevolence or ill will. Willful conduct consists of acts or failures to act that are intentional or voluntary rather than accidental or inadvertent. Conduct is "willful" if it is the product of free will rather than coercion. Thus, a person acts "willfully" if he or she is a free agent, knows what he or she is doing, and intends to do what he or she is doing....

The willfulness of particular conduct depends upon the actor's intent. Intent is seldom capable of direct proof, and triers-of-fact lack the ability to peer into a person's mind to assess intentions or motivations. Accordingly, triers-of-fact must infer intent from the circumstantial evidence, including a person's actions or conduct.

*Id*. at 863–64 (internal citations and footnotes omitted). This Court has held that failure to pay support is "willful" if the parent "is aware of his or her duty to support, has the capacity to provide the support, makes no attempt to provide support, and has no justifiable excuse for not providing the support." *In re J.J.C.*, 148 S.W.3d 919, 926 (Tenn. Ct. App.2004) (quoting *In re Adoption of Muir*, No. M2002–02963–COA–R3–CV, 2003 WL 22794524, at *5 (Tenn. Ct. App. Nov. 25, 2003)).

Mother first contends that she could not have willfully abandoned this child because there was no order entered requiring her to pay support. We disagree. In Tennessee, "[a] parent's obligation to support his or her child exists regardless of a court order requiring the parent to pay support." *In re Jacobe M.J.*, 434 S.W.3d 565, 572 (Tenn. Ct. App. 2013) (quoting Tenn. Code Ann. § 36-1-102(1)(H)). Furthermore, "[e]very parent who is eighteen (18) years of age or older is presumed to have knowledge of a parent's legal obligation to support such parent's child or children." *Id*. Accordingly, Mother's argument in this regard, is not persuasive.

Mother further contends that the Appellees refused to accept any support she offered to them. Mother specifically testified that, after the child first came into the Appellees' custody, she offered K.R.G. diapers and a car seat for the child, but that K.R.G. had indicated that she did

13

not need these items. Importantly, the relevant time period for failure to provide support in this case is dictated by statute as the four month period immediately preceding the filing of the petition to terminate parental rights. Tenn. Code. Ann. § 36-1-102(1)(A)(I). Here, the cross-petition for termination of parental rights was filed on July 1, 2013; accordingly, the relevant four month period would be from March 1, 2013 through June 30, 2013. The foregoing incident concerning the car seat and the diapers did not occur during the relevant period. As discussed below, there is no indication that Mother made any offers of support during the relevant statutory period.

In its April 29, 2014 order, the trial court made the following, relevant findings concerning the ground of abandonment by willful failure to support:

> The Court finds by clear and convincing evidence that [Mother] did not provide financial support for the [child] during the period from March 1, 2013 to July 1, 2013. . . and that her failure to do so was willful. [Mother] knew that she had an obligation to support [the child]. That knowledge comes from both the provisions of Tenn. Code Ann. §36-1-102(1)(H) and [Mother's] life experiences. She was receiving child support for her older child. . . . She filed a petition to seek child support [for M.J.C.] from [the biological father]. She gave money, on at least two occasions, to [the older child's grandmother] to help support [that child]. She acknowledged at trial that she had money left over each month that she could have used to provide support for [the child]. That money came from various forms of government assistance, the child support she received for [the older child], money she earned babysitting and doing hair, and gifts that she received from various members of her family. Further, even though [Mother] receives SSI, she is capable of working. During the time that she was pregnant with [the child], she worked cleaning houses with her aunt. . . .
> [Mother] justifies her failure to provide any support for [the child] based on her belief. . .that the [Appellees] would not accept support from her. While such a belief does not excuse [Mother's] failure to provide support for [the child] prior to December 3[], 2012, certainly after that date it can offer no basis, whatsoever, for nonsupport.

The trial court further found that, after Mother changed her mind about allowing Appellees

14

to adopt the child, and after a lawyer had been appointed to represent Mother,

> she could have requested that the Court set child support for her to pay the [Appellees] pending the final hearing in this case. She could have paid money into the office of the Clerk and Master for the support of [the child], assuming offers of support would have been declined by [Appellees] after January 1, 2013. [Mother] made no such efforts and took no such steps. Supporting [the child] was simply not something that [Mother] had in mind at any time after [the child] went to live with [I.M.] in June 2012. Her decision was willful.

Turning to the record, there is no evidence that Mother made any offers of support during the relevant statutory period, i.e., in the four months before the Appellees filed their petition. Both Appellees testified separately that Mother had not offered any means of support during the pertinent time period, and that Mother had not given the child any gifts for birthdays or Christmas. Mother specifically testified:

> Q [to Mother]: [A]t any time did you set aside money for [the child]?
>
> A. No.
>
> Q. You didn't set up any savings accounts?
>
> A. No.
>
> Q. Stash any cash for her.
>
> A. Nothing.
>
> Q. Did you ever, after August of 2012, pay any bills for [the child]?
>
> A. No.

The evidence clearly and convincingly supports the trial court's finding that Mother did not provide any support for this child during the statutory period. Concerning the willfulness of Mother's failure to support, Mother testified that she had money left over after she paid her

15

bills each month:

> A. When I pay my bills, I have like money to do whatever or
> buy the kids stuff of. . .
>
> Q. And why didn't you give that to the [Appellees]?
>
> A. Because they didn't want it.

As discussed earlier, the fact that the Appellees may have refused Mother's efforts does not excuse her from making those gestures, or from petitioning the court to hold money for the child. However, from the record, it does not appear that Mother made any efforts in this regard. After her initial offering of diapers and a car seat, there is no clear testimony that Mother ever actually offered any support for M.J.C. From the totality of the circumstances, we conclude that clear and convincing evidence in the record supports the trial court's conclusion that Mother abandoned this child by willful failure to support.

## V. Best Interest

When at least one ground for termination of parental rights has been established, the petitioner must then prove by clear and convincing evidence that termination of the parent's rights is in the child's best interest. *White v. Moody*, 171 S.W.3d 187, 192 (Tenn. Ct. App.1994). When a parent has been found to be unfit (upon establishment of ground(s) for termination of parental rights), the interests of parent and child diverge. *In re Audrey S.*, 182 S.W.3d at 877. The focus shifts to the child's best interest. *Id*. at 877. Because not all parental conduct is irredeemable, Tennessee's termination of parental rights statutes recognize the possibility that terminating an unfit parent's parental rights is not always in the child's best interest. *Id*. However, when the interests of the parent and the child conflict, courts are to resolve the conflict in favor of the rights and best interest of the child. Tenn. Code Ann. § 36–1–101(d). Further, "[t]he child's best interest must be viewed from the child's, rather than the parent's, perspective." *Moody*, 171 S.W.3d at 194.

The Tennessee Legislature has codified certain factors that courts should consider in ascertaining the best interest of the child in a termination of parental rights case. These factors include, but are not limited to, the following:

> (1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

16

      \*                                     \*                                 \*

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

      \*                                     \*                                 \*

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36–5–101.

Tenn. Code Ann. § 36–1–113(I). This Court has noted that "this list [of factors] is not exhaustive, and the statute does not require a trial court to find the existence of each enumerated factor before it may conclude that terminating a parent's rights is in the best interest of a child." *In re M.A.R.*, 183 S.W.3d 652, 667 (Tenn. Ct. App. 2005). Depending on the circumstances of an individual case, the consideration of a single factor or other facts outside the enumerated, statutory factors may dictate the outcome of the best interest analysis. *In re Audrey S*., 182 S.W.3d at 877. As explained by this Court:

Ascertaining a child's best interests does not call for a rote examination of each of Tenn. Code Ann. § 36-1-113(i)'s nine factors and then a determination of whether the sum of the factors tips in favor of or against the parent. The relevancy and weight to be given each factor depends on the unique facts of each case. Thus, depending upon the circumstances of a

particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis.

*White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004).

In its April 29, 2014 order, the trial court first noted Mother's lack of visitation with the child:

> Between August 28, 2012 and December 31, 2012, [Mother] saw [the child] on four occasions. She did not see her on her birthday in December 2012, nor did she see her at Christmas 2012. She was invited to attend [the child's] birthday party in December 2012, but did not do so. [Mother] did not see [the child] again until August 2013, when she began exercising supervised parenting time for an hour each Monday.

Based, in part, upon the lack of visitation and contact with the child, the trial court concluded that there was no meaningful relationship between Mother and M.J.C.:

> [Mother] does not have a meaningful relationship with [the child]. She has had very little contact with [the child] beginning in June 2012. When she saw [the child] in September 2012. . .she encouraged [the child] to refer to [Appellees] as "mommy and daddy." She admits that her relationship with [the child] is "poor." At one of her Monday morning visits in 2014, [Mother]. . . tried to tell [the child] that she was [her] mother. [Mother's] conduct was very upsetting to [the child]. By January 2014, [the child] no longer wanted to go to [visitation with Mother]. . . . After the Monday morning visits, [the child] displayed uncharacteristically negative behavior which took a while to subside and was of sufficient concern to the [Appellees] that they sought professional counseling for [the child]. The evidence in this case supports the Court's finding, and the Court does find that [Mother's] relationship with [the child] has a negative impact on [the child] and is not meaningful in a positive sense.

The evidence supports the trial court's findings regarding both the lack of visitation and the lack of a meaningful relationship between Mother and the child. From the record, it is clear that M.J.C. views Appellees as her mother and father, and that she has a significant bond with the Appellees' biological children. K.R.G. testified, and her testimony was corroborated

18

both by S.J.J.G. and a friend who lived with Appellees for some period of time after the child came into their home, that the child suffered from emotional issues, and was withdrawn when she first arrived at Appellees' home, but that the child has made marked improvements in both of these areas. Based upon this testimony, which was not disputed in the record, the trial court found that:

> [The child] was emotionally disturbed when she went to live with [Appellees]. . . . [Appellees] have invested an enormous amount of time and energy in helping [the child] modify her behavior. They have succeeded in doing so. [The child] has a place in their home and feels that she is a member of their family. Her portrait hangs with the portraits of [Appellees' biological children]. Her height chart is on the wall next to that of [the biological children]. She is depicted in the Christmas greeting as a member of the [Appellees'] family.

The evidence in the record suggests only that the Appellees see M.J.C. as their own child, and that she sees them as her parents, and Appellees' biological children as her siblings. No difference is made between the three children in the Appellees' home. The evidence further indicates that, since arriving at Appellees' home, M.J.C.'s vocabulary has improved, and her interaction with others has improved drastically. Based upon this evidence, the trial court specifically found that:

> To change [the child's] caretaker and place her in the physical and emotional environment offered by [Mother] is likely to have a serious negative emotional and psychological impact on [the child]. When asked why she wanted [the child] returned to her custody, [Mother] could only say that she wanted to "take her to school and take care of her." As instructed by the legislature, when the best interests of the child [are] in conflict with that of an adult, the conflict is to be resolved in favor of the child. . . .

We agree with the trial court's assessment. The evidence suggests only that M.J.C. is thriving in the Appellee's home. Given the fact that the child's last consistent contact with Mother was before June 2012, when the child was less than two years old, M.J.C. has no concept that Appellant is her mother. The only parents she has known are the Appellees. And although there is ample evidence to suggest that M.J.C. considers the Appellees' biological children to be her siblings, there is no indication that she has any significant bond with Mother's older child. To remove this child from the only home she has ever known, would likely cause irreparable harm at this age.

19

## VI. CONCLUSION

For the foregoing reasons, we affirm the order of the trial court, terminating Mother's parental rights. The case is remanded for such further proceedings as may be necessary and are consistent with this opinion. Costs of the appeal are assessed against the Appellant/Mother, M.C.. Because Mother is proceeding *in forma pauperis* in this appeal, execution may issue for costs if necessary.

_____
KENNY ARMSTRONG, JUDGE

20